THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* LYNN W. DORSEY, Defendant-Appellant.

First District (4th Division)   No. 81—814

Opinion filed September 16, 1982.

Steven Clark and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Kevin Sweeney, and Rhoda W. Davis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE LINN delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County, defendant, Lynn Dorsey, was found guilty of attempted murder and aggravated battery (Ill. Rev. Stat. 1979, ch. 38, pars. 8—4, 9—1, and 12—4). Defendant was sentenced to 40 years in prison for attempted murder.

Defendant makes the following arguments on appeal: (1) an injunction entered by the domestic relations division of the circuit court against returning to defendant the money posted as bail on these and other criminal charges operated to deny defendant his right to counsel of his choice; (2) the trial judge failed to give defendant the admonishments on waiver of counsel required by Supreme Court Rule 401(a) (73 Ill. 2d R. 401(a)), and as a result defendant did not knowingly waive his right to counsel; and (3) the trial judge's ruling that prevented defendant from calling several witnesses in his defense violated defendant's right to due process of the law.

We affirm.

## FACTS

Defendant was charged by indictment with the aggravated battery and attempted murder of his wife Jane. While the charges were pending, Jane filed a petition in the circuit court of Cook County for dissolution of her marriage to defendant. After his arrest for the attempted murder of Jane, defendant posted $2,000 to satisfy a $20,000 bond, and was released. On July 26, 1978, defendant was charged with aggravated arson and bond was set at $250,000. Defendant raised the $25,000 necessary to satisfy this second bond by selling the Dorsey home. On April 5, 1979, defendant was arrested for an unrelated murder; defendant was unable to satisfy the $500,000 bond in that case.

On April 19, 1978, pursuant to the dissolution of marriage proceedings, Jane obtained a temporary injunction in the domestic relations division of the circuit court of Cook County restraining the clerk of the circuit court from assigning, transferring, pledging, or in any other manner disposing of the bail money in the amount of $25,000. The temporary injunction order was continued from time to time and made permanent on May 16, 1979. On June 18, 1979, the domestic relations division ordered that the $2,000 bail deposit also be held in escrow by the circuit court clerk. Thus, the return to defendant of a total of $27,000 in bail deposits was enjoined by the domestic relations division of the circuit court. Defendant's motions to vacate the injunctions were denied by the trial judge in the instant attempted murder

and aggravated battery case, on the ground that "it's beyond my jurisdiction as long as there is an unappealed and effective order of another branch of the court."

Defendant had been represented by counsel in the marriage dissolution proceedings. Defendant stated that in spite of his wish to take an interlocutory appeal of the injunction against returning to him the bail posted, his counsel failed to do so. Defendant also had retained an attorney to represent him in the instant case, but that attorney requested and received leave to withdraw from the case before trial. In a motion to the trial court, defendant subsequently charged that attorney with ineffective assistance of counsel. On August 21, 1980, the day after defendant's counsel received leave to withdraw, a public defender was appointed for defendant. Defendant nevertheless contacted another attorney he wanted to represent him. That attorney told the trial judge he would represent defendant if he could be paid out of the bond deposits, and refused to represent defendant because the bail money was not available to pay his fee. During the trial defendant named 16 other attorneys he had contacted about representing him. Presumably, all of them declined to do so.

At a pretrial hearing on October 27, 1980, defendant requested leave to proceed *pro se*, telling the trial judge he did not want a public defender or an attorney from the Committee on Defense of Prisoners of the Chicago Bar Association to represent him. The judge accordingly read Supreme Court Rule 401(a) (73 Ill. 2d R. 401(a)) on waiver of counsel to defendant, explained that the purpose of the Rule is to insure that a waiver of counsel be knowingly and understandingly made, and thoroughly admonished defendant as the Rule requires.

On November 3, 1980, another pretrial hearing took place. Patrick Moriarty, an experienced criminal lawyer who was in private practice, was present at the trial judge's request to confer with defendant. After a three-hour meeting with Moriarty, defendant requested that he be appointed to represent defendant. The trial judge then appointed Moriarty as counsel to assist defendant.

At a hearing on defendant's motion to suppress evidence held on November 25, 1980, the trial judge reminded defendant of their earlier discussions of defendant's right to counsel. Defendant responded that he would seek counsel of his choice if the court would "free" the $27,000 bond money. The trial court told defendant that he could not do that, and defendant then stated again that he wished to proceed *pro se*. During the trial proceedings counsel Moriarty advised defendant, conducted the direct examination of defendant, and objected to

certain questions and statements made by the State's Attorneys. During the trial, defendant stated that he had had many arguments with counsel Moriarty and moved the court to compel his withdrawal. This motion was denied.

The evidence presented at trial revealed that Lynn and Jane Dorsey had been married for 12 years when the attempted murder of Jane Dorsey occurred. Jane testified that on April 1, 1978, she and defendant left the bar he managed at closing time, about 2:30 a.m., and went home. At home, defendant began to beat Jane, striking her about 10 times with his fists. He then struck her on the head once or twice with a fireplace poker and kicked her down the basement stairs. Defendant ordered Jane to sign a confession to a murder, and when she refused he banged her head against the cement floor until she lost consciousness.

A nurse who worked in the emergency room at South Suburban Hospital testified that she had received a telephone call about 5:15 p.m. on April 1, 1978. The caller told her that his wife was very sick and he was going to send her to the hospital by ambulance. During a long conversation, the caller said that "he had beat the hell out of her and pushed her down the stairs." He said his wife's name was Jane Dorsey. The nurse called an ambulance and the police.

Defendant took the police officer who responded to the call into a bedroom of defendant's home, where the officer saw a woman lying on a bed, nude and unconscious. Defendant told the officer that at 6 o'clock that morning, while intoxicated, he had had a fight with his wife and had thrown her down the stairs. The officer, a certified paramedic, observed that the woman's eyes were discolored and swollen shut, she had lacerations and contusions on her face, and several bruises on her legs. He also noticed that defendant's hands were discolored and swollen.

When Jane arrived at the emergency room she was comatose and in extremely critical condition. The nurse described Jane's injuries as swelling of the brain, a collapsed lung, extreme bruising of the face, arms, hands, legs, chest, and hips, and contusions and lacerations that had happened "a long time" before her arrival at the emergency room.

The doctor who treated Jane in the emergency room testified that Jane was in severe shock with hardly any blood pressure and pulse; she had multiple lacerations. Jane was paralyzed on the right side of her body because of a left phleborrhexis and subdural hematoma. On April 2, 1978, the testifying physician assisted a neurosurgeon who performed a craniectomy operation on Jane. A tracheotomy was also

performed, and Jane required breathing assistance for two weeks.

Jane testified that she recalled regaining consciousness more than a month after she was injured. She was discharged from the hospital on June 12, 1978, 79 days after she was admitted, still paralyzed. She had a very severe speech impediment, and needed assistance to eat or to get out of bed. At the time of trial, Jane was still undergoing speech and physical therapy and was confined to a wheelchair. She was living with her parents, and had filed a petition for dissolution of her marriage to defendant.

Defendant cross-examined his wife. Jane denied having purchased a gun. She denied trying to arrange defendant's murder. She denied pointing a gun at defendant while he slept, debating whether to kill him. Jane was aware of the injunction on defendant's bail money; she did not think the money would induce her to testify against defendant. She said she had never fired a gun.

Defendant called a married couple as witnesses who testified that they had seen guns in Jane's possession. An attorney who had been acquainted with defendant since 1970 or 1971 testified that he had represented defendant at a bond hearing after defendant had been arrested in April 1978. The attorney stated that defendant had told him Jane had shot at defendant. Defendant had shown the attorney a patch on the wall of defendant's house that defendant said covered bullet holes in the wall. The attorney did not recall seeing bullet holes. Defendant had also discussed a divorce with the attorney, and told him he had a document signed by Jane that purported to renounce her claims to her marital property. The State later stipulated to the existence of such a document.

Another defense witness testified that she never saw Jane with a weapon. Later in the trial, defendant read a statement by Dan McCallum into the record, which stated that Jane had offered him $10,000 to arrange to have defendant killed. The trial judge denied defendant's motion to call two ostensibly friendly but adverse witnesses. Defendant asked to recall the doctor and nurse who had testified previously. When the judge asked defendant's purpose, observing that defendant had cross-examined these witnesses when they testified, defendant said that he had not been prepared to go to trial at that time. Defendant wanted to question the doctor about the lack of depressions in Jane's skull, in view of Jane's testimony that defendant had struck her with a poker. Defendant's motion was denied. Defendant later requested permission to recall four other witnesses, including Jane Dorsey. This motion was denied also. Offers of proof by defendant that Jane had committed adultery with two men were de-

nied by the court. The trial judge would not permit defendant to call one of these men and his wife as court's witnesses; he told defendant, "You can call any witness that you wish to call." Defendant replied, "I am not going to vouch for these people's credibility. I don't know what they are going to say."

Defendant next called a friend of Jane's to testify. The witness said she had heard a rumor years ago that Jane was committing adultery with the Dorseys' neighbor. The witness had helped Jane leave her marital home in the 1960's. On cross-examination, the witness stated that Jane had been beaten at that time.

Defendant testified on his own behalf, with his court-appointed attorney conducting the direct examination. He testified that he left his tavern about 1:15 a.m. on April 1, 1978, and drove a customer home. He then went to several taverns and drank "quite a bit." He went home, drunk, before dawn. Jane made a derogatory comment about the person he had been with, and defendant hit her. Defendant accused Jane of committing adultery. The telephone rang, and as defendant answered it Jane came out of the bedroom with a revolver and fired two shots at defendant. Defendant grabbed Jane and took the gun away from her and then beat her. He threw her down the stairs and punched her, and her head went through a wall and hit a stud, which knocked her out. Defendant slapped her again; then he went upstairs for a blanket, which he threw at Jane. Defendant then went to sleep.

Several hours later, defendant woke up. Jane was still lying in the basement. Defendant carried her to bed, and then went to sleep again. He woke up several times and left the house once. At about 5:30 p.m., after Jane vomited, defendant called the hospital. Defendant stated he had not intended to kill his wife. During cross-examination, defendant denied striking Jane with a poker. He denied telling Jane that she should sign a document he had because "You're going to die anyway so you might as well sign it."

Closing argument was waived. The trial judge found that the defense of self-defense was totally unsupported by the evidence. The trial judge found the conclusion inescapable, in view of the serious and permanent nature of Jane's injuries, that defendant intended to kill Jane at the time he injured her. The judge also found defendant guilty of aggravated battery. Defendant was sentenced to a term of 40 years for attempted murder; no sentence was imposed for aggravated battery.

Opinion

## I

Defendant's first argument on appeal is that he was denied his constitutional right to be represented by counsel of his choice by an improper order issued by the domestic relations division of the circuit court, which prevented him from using cash deposited as bail to retain an attorney in his criminal case. Defendant concedes that under our unified court system there is no question that the domestic relations division had the power to enter an order affecting a case in the criminal division of the circuit court. However, defendant contends, the domestic relations division was without authority to enter this particular order enjoining the return of his bail bond deposits "to protect the interest of a private party." Finally, defendant maintains that even if the injunction was proper it had the effect of depriving him of counsel of his choice, and therefore warrants reversal of his conviction. We disagree.

Defendant has not shown that the money in question was his to spend, either for legal services or for any other purpose. The major part of the sum enjoined was the proceeds from the sale of defendant's home, which occurred during the pendency of Jane's suit for dissolution of the Dorseys' marriage. There evidently was some dispute about whether the home was marital property, because Jane allegedly had signed a document relinquishing her rights to her marital property. Thus the appropriate disposition of the money enjoined was an issue to be determined by the court in the dissolution proceedings, and that court's injunction against returning the money to defendant was properly issued to preserve the disputed property *pendente lite*. The trial judge in the instant case correctly ruled that he lacked authority to vacate an effective order of another branch of the court.

■ Bail bond money held by the circuit court clerk is in *custodia legis*, held solely to be disposed of as directed by statute. *A-1 Lithoplate, Inc. v. AFS Publishing Co.* (1978), 66 Ill. App. 3d 560, 384 N.E.2d 395.

> "When the conditions of the bail bond have been performed and the accused has been discharged from all obligations in the cause the clerk of the court shall return to the accused, *unless the court orders otherwise*, 90% of the sum which had been deposited and shall retain as bail bond costs 10% of the amount deposited. \*\*\*
>
> At the request of the defendant the court *may* order such 90% of defendant's bail deposit, or whatever amount repayable

to defendant from such deposit, to be paid to defendant's attorney of record." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 110—7(f).)

Here the domestic relations division had "ordered otherwise," as it was specifically authorized to do by the statute, and the criminal court properly recognized that order. That the court "may" order a defendant's bail deposit paid to his attorney (instead of to the defendant) is of no significance when an injunction against returning the money to anyone previously has been entered.

We find defendant's reliance on *Gende v. Flemming* (1977), 55 Ill. App. 3d 659, 371 N.E.2d 191, to support his contention that the court improperly refused to refund his money to be misplaced. *Gende* held that a private judgment creditor has no right to garnishee money in the possession of an agent of the court, and is factually distinguishable from the instant case on two bases. First, here it was not a judgment creditor seeking recovery of a private debt but the circuit court of Cook County seeking to preserve property at issue before it that prevented defendant from recovering his bail deposit at the time he wished. And second, defendant was not deprived permanently of his money; it was merely held in escrow pending a determination by the domestic relations division of whether the money belonged to defendant. During trial, in discussing this issue, the trial judge told defendant, "[T]hough you are prohibited—restrained from getting your hands on that money—it has not in fact been taken from you." Defendant replied, "That is true."

▪ Defendant urges that even if we find the injunction to have been proper, and we do so find, we should hold that the effect of the injunction was to deny defendant his sixth amendment right to counsel of his own choosing. We consider such a conclusion to be both unreasonable and unsupported by legal precedent; we hold that defendant's right to counsel was not violated under the circumstances of this case.

The primary defect in defendant's argument is his apparent assumption that by making a bail bond deposit he had in effect created a fund for payment of his legal fees. As we have already said, in this case there was an actual dispute about ownership of the funds. Even in the absence of an actual dispute, bail deposits presumptively belong to the defendant for the purposes of paying fines and costs (*People v. Nicholls* (1977), 45 Ill. App. 3d 312, 359 N.E.2d 1095, *aff'd as modified* (1978), 71 Ill. 2d 166, 374 N.E.2d 194), but do not presumptively belong to defendant for all purposes (*People v. Wood* (1980), 91 Ill. App. 3d 414, 414 N.E.2d 759). The State argues persuasively that the

constitutional right to counsel has never been interpreted as a right to keep one's assets free from all encumbrances so that they can be spent to pay attorney fees.

A defendant's right to assistance of counsel (U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, sec. 8; Ill. Rev. Stat. 1979, ch. 38, par. 113—3) includes the right to assistance of counsel of his choice. (*People v. Burson* (1957), 11 Ill. 2d 360, 143 N.E.2d 239.) However, while the right to counsel is absolute, the right to choice of counsel is limited (*People v. Spurlark* (1978), 67 Ill. App. 3d 186, 384 N.E.2d 767), and "such right may not be employed as a weapon to *** thwart the administration of justice, or to otherwise embarrass the effective prosecution of crime." *People v. Solomon* (1962), 24 Ill. 2d 586, 590, 182 N.E.2d 736, 739, *cert. denied* (1962), 371 U.S. 853, 91 L. Ed. 2d 87, 83 S. Ct. 94. See also *People v. Mueller* (1954), 2 Ill. 2d 311, 118 N.E.2d 1; *People v. Langdon* (1979), 73 Ill. App. 3d 881, 392 N.E.2d 142.

Here, defendant claims that the injunction on his bail deposit precluded him from retaining counsel of his choice despite the fact that the trial judge appointed an attorney who advised defendant and participated in his trial, and represented defendant at the sentencing hearing. In *Kelly v. Springett* (9th Cir. 1975), 527 F.2d 1090, 1093, such a contention was analyzed as follows:

> "The broad statement that an accused has a constitutional right to retained counsel must be qualified in at least two important respects. Either the accused must have been denied effective assistance of appointed counsel, *Powell v. Alabama*, 287 U.S. 45, 53 S. Ct. 55, 77 L. Ed. 158, (1932), or he must have been entirely unrepresented by counsel. *Chandler v. Fretag*, 348 U.S. 3, 75 S. Ct. 1, 99 L. Ed. 4 (1954)."

*Kelly* held that "the effective assistance of appointed counsel prevented the accused from successfully claiming a constitutional deprivation by reason of absence of counsel of his own choice." 527 F.2d 1090, 1093.

Defendant's effort to distinguish the *Kelly* decision on the ground that defendant Kelly's funds were seized by the State rather than by a private creditor is unavailing in view of our holding that the injunction issued by the domestic relations division was a valid restraint on the return of the funds at issue. The effect of the injunction was to render defendant indigent for purposes of retaining private counsel. While a criminal defendant may not be deprived of counsel because of his inability to pay for legal services (*Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792), an indigent defendant

has no right to choose his own counsel absent a showing of good cause (*People v. Sylvester* (1979), 71 Ill. App. 3d 130, 389 N.E.2d 601). Although defendant claimed that he disagreed with his counsel during trial, he has failed to show that his appointed counsel's assistance was ineffective. We hold that defendant's constitutional right to counsel has not been abridged or denied.

## II

Defendant's second argument is that the trial judge failed to give him the admonishments on waiver of counsel required by Supreme Court Rule 401(a) (73 Ill. 2d R. 401(a)), and defendant therefore did not knowingly waive his right to counsel. This claim lacks merit for two reasons. First, the record reveals that at the pretrial hearing at which defendant stated that he wished to proceed *pro se*, the trial judge thoroughly discussed this matter with defendant. The judge read Supreme Court Rule 401(a) to defendant verbatim, explained the purpose of the Rule, and admonished defendant in accordance with the Rule's provisions. Defendant's claim that he did not receive the required admonitions is directly contradicted by the record.

Furthermore, the record indicates that defendant accepted the services of an attorney appointed to represent him. Because defendant had told the trial judge he did not want a public defender, the judge asked an experienced criminal attorney in private practice, Patrick Moriarty, to represent defendant. Moriarty conferred with defendant for more than three hours at the court's request, and the two agreed that Moriarty "could provide assistance to him of a technical nature while he was conducting his own defense." Defendant specifically requested the appointment of Moriarty to represent him, which was done by the trial judge. Defendant's attorney was present at the trial; he advised defendant and explained the proceedings when necessary, made an offer of proof on defendant's behalf, conducted the direct examination of defendant, and frequently objected to questions or comments by the prosecutor.

Thus, although defendant stated that he wished to proceed *pro se*, we think this situation falls within the rule that "[w]hen 'a defendant requests that he be allowed to conduct his own defense with the assistance of a court-appointed lawyer, he does not waive the right to counsel.' " (*People v. Pittman* (1979), 75 Ill. App. 3d 683, 687, 394 N.E.2d 702, 705, quoting *People v. Lindsey* (1974), 17 Ill. App. 3d 137, 141, 308 N.E.2d 111, 115.) In such a situation it is not necessary that a defendant be given the admonitions of Supreme Court Rule 401(a) because the defendant has not waived counsel

within the meaning of the Rule. (*People v. Pittman.*) For both of these reasons we find defendant's second claim of error to be entirely lacking in merit.

### III

Finally, defendant claims that his right to due process of the law was violated by the trial judge's refusal to permit him to call Jane Dorsey and the emergency room doctor and nurse to testify. The court's ruling was based on the fact that defendant had cross-examined these witnesses at the time they were called by the State. The record indicates that the further questions defendant wished to ask of these witnesses could properly have been asked when defendant cross-examined them.

■ Defendant correctly points out that evidence that is probative of an issue should be heard. (*Marr v. Marr* (1963), 43 Ill. App. 2d 25, 192 N.E.2d 559.) However, it is also true that "the decision whether a party may introduce evidence that should have been introduced earlier rests largely in the discretion of the trial court." (*Savitch v. Allman* (1977), 52 Ill. App. 3d 884, 888, 368 N.E.2d 224, 227.) Considering that the probative value of the evidence defendant wished to present was doubtful, that the questions were of such a nature that they should have been asked during cross-examination, and that defendant had ample opportunity to cross-examine these witnesses, we find no abuse of discretion in the trial judge's denial of defendant's request to call these witnesses to testify further.

■ Alternatively, we hold that even if defendant should have been permitted to call these witnesses, the trial judge's refusal to do so was harmless error in view of the proof beyond a reasonable doubt of defendant's guilt. "Where the competent evidence shows, beyond all reasonable doubt, that the defendant is guilty *** error will not ordinarily require reversal of the judgment of conviction." *People v. Tranowski* (1960), 20 Ill. 2d 11, 17, 169 N.E.2d 347, 350, *cert. denied* (1960), 364 U.S. 923, 5 L. Ed. 2d 262, 81 S. Ct. 290; (1962), 368 U.S. 978, 7 L. Ed. 2d 440, 82 S. Ct. 484.

For all of the reasons discussed above, defendant's conviction is affirmed.

Affirmed.

JIGANTI and ROMITI, JJ., concur.