THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM J. CONLEY, Defendant-Appellant.

First District (3rd Division)   No. 1—86—2651

Opinion filed August 2, 1989.

Anna Ahronheim, of State Appellate Defender's Office, of Chicago, for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund, Patricia Y. Brown, and Lauren Brown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

The defendant, William J. Conley, was charged with two counts of aggravated battery based on permanent disability and great bodily harm. (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a).) He was found guilty after a jury trial of aggravated battery based solely on permanent disability on July 17, 1986. The defendant's motions for judgment notwithstanding the verdict or a new trial were denied, and the defendant was sentenced to 30 months' probation including 40 days of periodic imprisonment. On appeal, it is contended that: (1) the State failed to prove beyond a reasonable doubt that the victim incurred a permanent disability and that the defendant intended to inflict a permanent disability; (2) the trial court erred in prohibiting the defense from asking a State identification witness to describe the offender during defendant's case in chief; (3) the trial court erred in allowing the admission of evidence elicited during State cross-examination that defense witnesses failed to tell police that the offender was another individual; (4) the State's use during cross-examination and in closing argument of defendant's pretrial silence deprived the defendant of a fair trial; and (5) the trial court erred in prohibiting defense counsel from arguing to the jury that the victim had a financial motive in securing a verdict and in telling the jury that financial motive was not in issue. For the following reasons, we affirm.

The defendant was charged with aggravated battery in connection with a fight which occurred at a party on September 28, 1985, in unincorporated Orland Township. Approximately 200 high school students attended the party and paid admission to drink unlimited beer. One of those students, Sean O'Connell, attended the party with several friends. At some point during the party, Sean's group was approached by a group of 20 boys who apparently thought that someone in Sean's group had said something derogatory. Sean's group denied making a statement and said they did not want any trouble. Shortly thereafter, Sean and his friends decided to leave and began walking toward their car which was parked a half block south of the party.

A group of people were walking toward the party from across the street when someone from that group shouted "There's those guys from the party." Someone emerged from that group and approached Sean, who had been walking with his friend Marty Carroll

10 to 15 steps behind two other friends, Glen Mazurowski and Dan Scurio. That individual demanded that Marty give him a can of beer from his six-pack. Marty refused, and the individual struck Sean in the face with a wine bottle, causing Sean to fall to the ground. The offender attempted to hit Marty, but missed as Marty was able to duck. Sean sustained broken upper and lower jaws and four broken bones in the area between the bridge of his nose and the lower left cheek. Sean lost one tooth and had root canal surgery to reposition 10 teeth that had been damaged. Expert testimony revealed that Sean has a permanent condition called mucosal mouth and permanent partial numbness in one lip. The expert also testified that the life expectancy of the damaged teeth might be diminished by a third or a half.

At trial, the State presented Officer Houlihan, Doctor Arnold S. Morof, and five occurrence witnesses. Of the five occurrence witnesses, only Marty Carroll identified Conley as the offender. The only other witness connecting Conley to the crime was another student, Demetrius Kereakas, who testified that he saw Conley throw a bottle at Dan Scurio's car as the four boys left after the incident. The defense recalled State witness Marty Carroll and presented seven witnesses in addition to the defendant. Four of the defense witnesses testified that the defendant was not the offender, but rather that Sean was hit by a Robert Frazer, who is known in school as "Crazy Bob" or "Terminator." The party was held at a residence surrounded by open fields. There were no streetlights and most of the witnesses had been drinking before the incident.

At the end of the trial, the jury was furnished with four verdict forms for the two counts of aggravated battery. The jury returned a guilty verdict for aggravated battery based on permanent disability, failing to sign the remaining verdict forms. The State's Attorney advised the trial judge that the jury had returned only one verdict but that he had no objections. The trial court accepted the verdict and discharged the jury. It must be noted here that when a verdict on less than all the counts is accepted by the trial court and the jury is discharged, the jury's silence as to other counts is treated as an acquittal on those counts for purposes of double jeopardy. (*People v. Thurman* (1983), 120 Ill. App. 3d 975, 979, 458 N.E.2d 1038, *aff'd in part and rev'd in part on other grounds* (1984), 104 Ill. 2d 326, 472 N.E.2d 414; *People v. Rollins* (1982), 108 Ill. App. 3d 480, 485, 438 N.E.2d 1322.) Therefore, had this court found it necessary to reverse and remand for a new trial, the defendant could not have been retried for aggravated battery based on great bodily harm.

■ The defendant initially contends on appeal that the State failed to prove beyond a reasonable doubt that Sean O'Connell incurred a permanent disability. Section 12—4(a) of the Criminal Code of 1961 provides that: "[a] person who, in committing a battery, intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement commits aggravated battery." (Ill. Rev. Stat. 1983, ch. 38, par. 12—4(a).) The defendant contends there must be some disabling effect for an aggravated battery conviction based on permanent disability. The defendant does not dispute that Sean lost a tooth or that surgery was required to repair damaged teeth. The defendant also does not dispute that Sean will have permanent partial numbness in one lip or suffer from a condition called mucosal mouth. The defendant maintains, however, that there is no evidence as to how these injuries are disabling because there was no testimony of any tasks that can no longer be performed as a result of these injuries.

The parties cite no Illinois decisions, nor have we found any, defining permanent disability in the context of aggravated battery. The State relies on *People v. Post* (1982), 109 Ill. App. 3d 482, 440 N.E.2d 631, and *People v. Hicks* (1984), 101 Ill. 2d 366, 462 N.E.2d 473, for the proposition that loss of function is not required for a finding of permanent disability. In *Post*, the victim had been stabbed once in the back and three times in the leg, but incurred only permanent scarring. The court affirmed the defendant's conviction for aggravated battery based on permanent disability. However, *Post* is not dispositive of the issue as the defendant was also convicted of aggravated battery based on great bodily harm and disfigurement, and the defendant never raised the issue of sufficiency of the evidence regarding permanent disability. In *Hicks*, a young girl received severe burns on her chest caused by boiling water. *Hicks* is also not dispositive of the issue as the defendant was convicted of heinous battery. Thus, as the defendant points out in his reply brief, this appears to be a question of first impression.

■ The function of the courts in construing statutes is to ascertain and give effect to the intent of the legislature. (*People v. Steppan* (1985), 105 Ill. 2d 310, 316, 473 N.E.2d 1300.) The starting point for this task is the language itself (*People v. Boykin* (1983), 94 Ill. 2d 138, 141, 455 N.E.2d 1174), and the language should be given its plain and ordinary meaning. (*Steppan*, 105 Ill. 2d at 317; *People v. Pettit* (1984), 101 Ill. 2d 309, 313, 461 N.E.2d 991.) The defendant urges the court to adopt the definition found in Webster's Third New International Dictionary which defines disability as an "inability to do

something." The State refers to additional language from the same source that a disability is a "physical or mental illness, injury, or condition that incapacitates in any way." (Webster's Third New International Dictionary 642 (1986).) There is some support for defendant's proposed definition in an old Illinois decision. In *Dahlberg v. People* (1907), 225 Ill. 485, 80 N.E. 310, a woman was convicted of assault with intent to commit mayhem (aggravated battery incorporates the earlier offense of mayhem) after she threw red pepper at someone's eyes and missed, hitting an innocent bystander in the eyes instead. Her conviction was reversed because the crime of attempt requires that the offender employ adequate means to accomplish the attempted result, and the evidence revealed that blindness could not have resulted had she succeeded. (*Dahlberg*, 225 Ill. at 490.) Thus, by necessary implication, anything short of blindness would not have supported a conviction for mayhem.

In arriving at a definition, however, it is also proper to consider the statute's purpose and the evils sought to be remedied. (*Steppan*, 105 Ill. 2d at 316.) The Committee Comment explains that section 12—4(a) incorporates the old offense of mayhem. (Ill. Ann. Stat., ch. 38, par. 12—4(a), Committee Comment at 465 (Smith-Hurd 1979).) At common law the offense of mayhem required the dismemberment or disablement of some bodily part. Initially, the law sought to protect the King's right to the military services of his subjects. However, modern criminal codes have expanded their protection against a wider range of injuries. As one court explained:

> "What, then, originated as the narrow common law offense of mayhem is generally today a statutory offense of considerably larger dimensions. The transition has been accompanied, if not induced, by a shift in emphasis from the military and combative effects of the injury to' the preservation of the human body in normal functioning. The statutory counterparts of nonstatutory mayhem doubtless include all that the common law proscribed. But what is important now is not the victim's capacity for attack or defense, but the *integrity of his person.*" (Emphasis added.) (*United States v. Cook* (D.C. Cir. 1972), 462 F.2d 301, 303.)

Under this view, it seems apparent that for an injury to be deemed disabling, all that must be shown is that the victim is no longer whole such that the injured bodily portion or part no longer serves the body in the same manner as it did before the injury. Applying this standard to the case at hand, the injuries Sean O'Connell suffered are sufficient to constitute a permanent disability. Sean will en-

dure permanent partial numbness in one lip and mucosal mouth.[1] He lost one tooth and there is also a chance he may lose some teeth before attaining the age of seventy.

The defendant further argues that the State failed to prove beyond a reasonable doubt that he intended to inflict any permanent disability. The thrust of defendant's argument is that under section 12—4(a), a person must intend to bring about the particular harm defined in the statute. The defendant asserts that while it may be inferred from his conduct that he intended to cause harm, it does not follow that he intended to cause permanent disability. The State contends it is not necessary that the defendant intended to bring about the particular injuries that resulted. The State maintains it met its burden by showing that the defendant intentionally struck Sean.

The law on this question is unclear. The defendant relies upon *People v. Crosser* (1983), 117 Ill. App. 3d 24, 27, 452 N.E.2d 857, and *Bay State Insurance Co. v. Wilson* (1982), 108 Ill. App. 3d 1096, 440 N.E.2d 131, which both hold that aggravated battery is a specific intent crime. The State, however, relies upon *People v. Allen* (1969), 117 Ill. App. 2d 20, 254 N.E.2d 103. In *Allen*, the court wrote that in committing the offense of aggravated battery, "the only mental state required is that the accused knowingly and intentionally cause the social harm defined in the statute, no premeditation or malice being necessary." (*Allen*, 117 Ill. App. 2d at 27-28.) The court then went on to state that it is not necessary that the defendant intended to cause the particular injury which resulted. (*Allen*, 117 Ill. App. 2d at 28.) Resolution of this issue is made difficult as there exist inconsistent decisions within the first district. *Allen* is cited with approval by the third division in *People v. Perry* (1974), 19 Ill. App. 3d 254, 259, 311 N.E.2d 341; however, specific intent analysis is applied in another decision by the third division in *People v. Farrell* (1980), 89 Ill. App. 3d 262, 264-65, 411 N.E.2d 927. The fifth division has also produced inconsistent decisions. In *People v. Gomez* (1986), 141 Ill. App. 3d 935, 939, 491 N.E.2d 68, it was stated that aggravated battery is a specific intent crime. However, just the opposite was written in *People v. Gvojic* (1987), 160 Ill. App. 3d 1065, 1069, 513 N.E.2d 1083.

For proper resolution of this issue, it is best to return to the statutory language. Section 12—4(a) employs the terms "inten-

---

[1]The State's expert witness never defined mucosal mouth and its meaning cannot be gleaned from the record. The defendant, however, never challenged the expert's testimony.

tionally or knowingly" to describe the required mental state. The relevant statutes state:

"4—4. Intent. A person intends, or acts intentionally or with intent, to accomplish a result or engage in conduct described by the statute defining the offense, when his conscious objective or purpose is to accomplish that result or engage in that conduct." (Ill. Rev. Stat. 1987, ch. 38, par. 4—4.)

"4—5. Knowledge. A person knows or acts knowingly or with knowledge of:

(b) The result of his conduct, described by the statute defining the offense, when he is consciously aware that such result is practically certain to be caused by his conduct." (Ill. Rev. Stat. 1987, ch. 38, par. 4—5.)

Section 12—4(a) defines aggravated battery as the commission of a battery where the offender intentionally or knowingly causes great bodily harm, or permanent disability or disfigurement. Because the offense is defined in terms of result, the State has the burden of proving beyond a reasonable doubt that the defendant either had a "conscious objective" to achieve the harm defined, or that the defendant was "consciously aware" that the harm defined was "practically certain to be caused by his conduct." (See *People v. Herr* (1980), 87 Ill. App. 3d 819, 821, 409 N.E.2d 442.) This is the identical construction found in *People v. Farrell* (1980), 89 Ill. App. 3d 262, 264-65, 411 N.E.2d 927, which we conclude is the correct statement of the law.

■■ ■ Although the State must establish the specific intent to bring about great bodily harm, or permanent disability or disfigurement under section 12—4(a), problems of proof are alleviated to the extent that the ordinary presumption that one intends the natural and probable consequences of his actions shifts the burden of production, though not persuasion, to the defendant. (*Farrell*, 89 Ill. App. 3d at 265.) If the defendant presents evidence contrary to the presumption, then the presumption ceases to have effect, and the trier of fact considers all the evidence and the natural inferences drawn therefrom. (*Farrell*, 89 Ill. App. 3d at 265.) Intent can be inferred from the surrounding circumstances, the offender's words, the weapon used, and the force of the blow. (See, *e.g.*, *Macklin v. Commonwealth Life & Accident Co.* (1970), 121 Ill. App. 2d 119, 126-27, 257 N.E.2d 256.) As the defendant's theory of the case was mistaken identity, there was no evidence introduced negating the presumption of intent. However, even if Conley had denied any intention to inflict permanent disability, the surrounding circumstances, the use of a bot-

tle, the absence of warning and the force of the blow are facts from which the jury could reasonably infer the intent to cause permanent disability. Therefore, we find the evidence sufficient to support a finding of intent to cause permanent disability beyond a reasonable doubt.

The defendant next contends that the trial court improperly restricted the scope of his examination of State witness Marty Carroll during his case in chief. During the evening following the close of the prosecution's case, Conley remembered having a conversation with Carroll at another party where Carroll allegedly made a statement inconsistent with his testimony. Advised of this development, the trial judge permitted the defendant to recall Carroll so that a foundation could be established for later impeachment when Conley testified. After a foundation had been laid, the trial court prohibited the defendant from pursuing an additional line of questioning when the State objected to questions asking Carroll to describe the offender.

■■ ■ The defendant's argument assumes that *People v. Aughinbaugh* (1967), 36 Ill. 2d 320, 223 N.E.2d 117, and *People v. Morris* (1964), 30 Ill. 2d 406, 197 N.E.2d 433, are controlling. These decisions hold that where identification is a principal issue at trial, the defendant is entitled to wide latitude in conducting cross-examination of identification witnesses. These decisions, however, are limited to cross-examination during the State's case in chief. It is well established in Illinois that the decision to recall a witness for further cross-examination after the close of the adversary's case is within the sound discretion of the trial court. (*People v. Smith* (1986), 149 Ill. App. 3d 145, 152, 500 N.E.2d 605.) The trial court's decision on this matter will not be reversed absent a clear abuse of discretion. (*Smith*, 149 Ill. App. 3d at 152.) In *People v. Dorsey* (1982), 109 Ill. App. 3d 218, 440 N.E.2d 394, the defendant argued that his right to due process was violated when the trial court denied his request to recall three witnesses for additional cross-examination in his case in chief. The court held that there was no abuse of discretion where the defendant had an opportunity to cross-examine the witnesses, the questions the defendant wished to ask could have been presented at defendant's previous cross-examination during the State's case, and the evidence the defendant hoped to introduce had little probative value. (Dorsey, 109 Ill. App. 3d at 229. See also *People v. Lewis* (1980), 89 Ill. App. 3d 840, 845, 412 N.E.2d 565.) Here, the defendant had an opportunity to cross-examine Marty Carroll during the State's case and his questions regarding the offender's description

should have been presented at that time. Therefore, there was no abuse of discretion in prohibiting the defendant from pursuing this line of questioning.

Next, the defendant argues that the trial court erred in permitting improper impeachment of four defense witnesses. Matt Tanzer, Kevin McGinley, and Joseph Longhini testified they were present when Sean was hit and that Bob Frazer, and not the defendant, was the culprit. Scott Bucich testified that he observed the defendant in a different altercation not involving Sean. On cross-examination, the witnesses admitted they failed to volunteer this information to the police which may have exonerated the defendant. The defendant maintains that the trial court erroneously overruled his objections for lack of foundation because there was no showing that the police or other authority ever questioned these witnesses. The defendant relies on *People v. Fabian* (1976), 42 Ill. App. 3d 934, 356 N.E.2d 982, construing that decision to hold that a witness' failure to volunteer knowledge of a murderer's identity to police during earlier conversations was not impeaching because the police never inquired as to his ability to identify the offender. Defendant's reliance on *Fabian* is misplaced, however, as the issue in *Fabian* was the weight, and not the admissibility, of the evidence in determining whether the defendant was proved guilty beyond a reasonable doubt. *Fabian*, 42 Ill. App. 3d at 938.

■■ ■ The rule for impeachment by omission is that it is permissible to use prior silence to discredit a witness' testimony if: (1) it is shown that the witness had an opportunity to make a statement, and (2) under the circumstances, a person would normally have made the statement. (*People v. McMath* (1968), 104 Ill. App. 2d 302, 315, 244 N.E.2d 330, *aff'd* (1970), 45 Ill. 2d 33, 256 N.E.2d 835, *cert. denied* (1970), 400 U.S. 846, 27 L. Ed. 83, 91 S. Ct. 92.) At issue here is whether the State properly established the required evidentiary foundation for this impeachment. In *People v. Taylor* (1986), 141 Ill. App. 3d 839, 491 N.E.2d 3, two defense witnesses testified that the victim of a shooting had been shot by his own brother, and not by the defendant, when the brother fired a gun into a crowd during a street altercation. The witnesses admitted on cross-examination that they failed to go to the police with this information which may have exonerated the defendant. The court held this impeachment was proper because the witnesses, who were friends of the defendant, knew of the defendant's arrest eight months before trial. (*Taylor*, 141 Ill. App. 3d at 845-46.) And in *People v. Martinez* (1979), 76 Ill. App. 3d 280, 284-85, 395 N.E.2d 86, this court ruled that a prosecu-

tor's questions regarding a witness' failure to go to the police were permissible where the witness who was a friend of the accused waited eight months to tell his story supporting the defendant's claim of self-defense. On the other hand, in *People v. Watson* (1981), 94 Ill. App. 3d 550, 557-58, 418 N.E.2d 1015, similar impeachment of an alibi witness was held improper for lack of foundation where the witness did not learn of the defendant's alleged crime until five months after his arrest, and the State did not attempt to interview the witness despite receiving notice of defendant's alibi defense. Read together, these decisions indicate that where a witness is a friend of the accused, and has had knowledge of the friend's arrest before trial, evidence of the witness' failure to give exculpatory information to the authorities is admissible to impeach an exculpatory story offered for the first time at trial. However, where the witness has not had sufficient notice, there must be evidence of other circumstances under which a reasonable person would have given exculpatory information to the authorities. For the case before us, resolution of this issue requires an examination of the pertinent testimony of each witness.

Matt Tanzer testified that he was a close friend of the defendant. Tanzer also testified that he had discussed the case with the defendant and other friends before trial. Although there was no testimony elicited on cross-examination as to how much time had elapsed before trial during which Tanzer knew of the defendant's arrest, we do not believe this less than perfect examination to be reversible error. Thus, a sufficient foundation was established for impeaching Tanzer.

Joseph Longhini testified he had only known the defendant for less than a year and was not a close friend. However, Longhini also testified that he discussed the case with the defendant before trial and told him he would be available if the defendant needed him. Thus, a sufficient foundation was established.

Kevin McGinley testified that he was a close friend of the defendant. However, in addition to the absence of testimony indicating when he first learned of the defendant's arrest, there was also no testimony that he had discussed the case with anyone. Moreover, no investigators for the police or the State ever questioned McGinley as to what he knew. Therefore, use of his prior silence was improper for lack of foundation.

Scott Bucich testified that he had known the defendant for a number of years. Bucich also testified that he discussed the case with the defendant before trial when the defendant called him to learn what Bucich knew of the incident. However, Bucich was a witness

only to the defendant's altercation with another individual named John O'Brien. Under these circumstances, a friend of the accused would not normally go to the police to volunteer information pertaining to a separate fight. Thus, the use of Bucich's prior inaction was improper.

●14, 15 Nonetheless, this court finds these errors to be harmless. Error is harmless where a reviewing court can safely conclude, after consideration of the totality of the evidence, that a trial without the error would not produce a different result. (*People v. Warmack* (1980), 83 Ill. 2d 112, 128-29, 413 N.E.2d 1254.) To say that the failure of McGinley and Bucich to volunteer information to the police affected the outcome of the case is speculative, especially in view of the fact that Tanzer and Longhini were properly impeached.

■■■■ The fourth issue raised by the defendant is whether the State improperly used the defendant's pretrial silence to impeach his mistaken identity theory in violation of the due process clause of the fourteenth amendment and Illinois evidentiary law. The State sought to discredit the mistaken identity theory as a recent fabrication since the defendant failed to inform the police about Bob Frazer, who the defendant claimed at trial to be the true offender. Examination of this issue must be in two parts as reference was made at trial to two separate occasions where the defendant did not inform the police of the identity of the individual claimed to be the true offender. We first address the State's use of the defendant's pre-arrest silence.

On October 7, Officer Houlihan visited Andrew High School and obtained permission to interview the defendant. Houlihan read the *Miranda* warnings to the defendant before proceeding with the interview. There was conflicting testimony as to what exactly the defendant had said during his interrogation at Andrew High School. Investigator Houlihan testified that Conley admitted to striking an individual he didn't know with his fist and that the individual fell to the ground. The defendant, however, testified that he had told Houlihan that he fought an individual by the name of John O'Brien and that he gave a description of O'Brien to Houlihan. The defendant further testified that Houlihan stated he had a report of only one fight involving Sean O'Connell and asked him why his fight had not been reported. Conley responded that he didn't know but that it probably was not reported because no one was hurt. Nevertheless, it is clear that Conley never mentioned the name of Bob Frazer to Houlihan when questioned about his activities at the party and that this fact was elicited during his cross-examination. The record reveals the following colloquy:

"Q. And so you saw Marty Carroll at the second Sandora party that you made?

A. Yes, I did.

Q. And he was pointing a finger at you?

A. He sure did.

Q. He said, 'That's the guy who hit Shawn with the bottle.'

A. Yes.

Q. You said to him, 'It wasn't me. I know who did it.' Didn't you say that?

A. Yes, I did.

Q. And you told Officer Houlihan who that was, didn't you?

A. No, I did not tell him.

Q. I have nothing further."

The defendant did not object to the State's question because he felt that his silence could be adequately explained. On redirect, the defendant testified that he had not learned of Bob Frazer until two to three weeks after his interview with Houlihan. The defendant now argues that the State's use of this silence was improper under *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240. In *Doyle v. Ohio*, the United States Supreme Court held that use of a defendant's post-arrest silence to impeach his exculpatory testimony offered for the first time at trial is a deprivation of due process of law. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240.) The court reasoned that silence following recitation of the *Miranda* warnings may be nothing more than the arrestee's exercise of those rights and, therefore, post-arrest silence is always "insolubly ambiguous." (*Doyle*, 426 U.S. at 617, 49 L. Ed. 2d at 97, 96 S. Ct. at 2244.) The Court further reasoned that implicit in the *Miranda* warnings is the promise that silence will carry no penalty should the accused invoke that right. (*Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) Therefore, the Court concluded that it would be fundamentally unfair to permit use of such silence against the accused after inducing him to remain silent. (*Doyle*, 426 U.S. at 618, 49 L. Ed. 2d at 98, 96 S. Ct. at 2245.) Because Conley was successfully rehabilitated on redirect (*cf. United States v. Wilkins* (7th Cir. 1981), 659 F.2d 769, 776), we conclude that if the State's use of Conley's pre-arrest silence violated *Doyle*, such error was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824.

●17 Following redirect, however, the State again sought to impeach the defendant's mistaken identity theory on recross, using the defendant's post-arrest silence. On October 16, nine days after his in-

terview with Houlihan, the defendant participated in a lineup. At the conclusion of the lineup, the defendant was placed under arrest at which time no statements were made. The record does not reveal whether the defendant was advised of his *Miranda* rights, but it appears that Conley was not so advised immediately upon his arrest. Following the defendant's rehabilitation on redirect, the State countered on recross with a reference to the defendant's silence following his arrest. The record reveals the following colloquy:

"Q. You saw Houlihan on October the 16th, didn't you?

A. I believe that was the date for the line-up. I'm not sure.

Q. And after the lineup, that's when Officer Houlihan told you you're under arrest, isn't that right?

A. I believe so.

Q. And at that time you didn't tell officer—.

DEFENSE COUNSEL: I'm objecting now.

THE COURT: Sustained.

PROSECUTOR: I have nothing further, Judge."

The State contends, first, that its reference to Conley's post-arrest silence did not deprive him of due process because he had not been advised of his *Miranda* rights upon arrest. The State relies upon *Fletcher v. Weir* (1982), 455 U.S. 603, 71 L. Ed. 2d 490, 102 S. Ct. 1309, which held that cross-examination as to post-arrest silence is permissible where such silence has not been induced by the governmental assurances embodied in the *Miranda* warnings. (*Fletcher*, 455 U.S. at 607, 71 L. Ed. 2d at 494, 102 S. Ct. at 1312.) The State also contends there was no "use" of silence because the State was prevented from completing the question when the trial court sustained the defendant's objection, and the jury was instructed to disregard questions to which objections were sustained. (See *Greer v. Miller* (1987), 483 U.S. 756, 97 L. Ed. 2d 618, 107 S. Ct. 3102.) The defendant argues, however, that *Fletcher* is inapplicable because he had been advised of his *Miranda* rights nine days before his arrest at the October 7 interview. The defendant further contends that *Greer v. Miller* is inapposite because, unlike *Greer*, the trial court failed to immediately admonish the jury after sustaining his objection, and the prosecutor defied the trial court by mentioning the defendant's silence in rebuttal argument. On the other hand, the defendant contends that the State's inquiry into his post-arrest silence is in violation of Illinois evidentiary law even if he has not been deprived of due process. (See *People v. McMullin* (1985), 138 Ill. App. 3d 872, 486 N.E.2d 412.) Because *Doyle* establishes only a minimum constitutional threshold for fairness under the due process clause, each juris-

diction is free to define for itself when silence is more probative than prejudicial under its rules of evidence. (See *Jenkins v. Anderson* (1980), 447 U.S. 231, 240, 65 L. Ed. 2d 86, 96, 100 S. Ct. 2124, 2130.) The defendant's silence was not admitted into evidence, however, as the trial court sustained the defendant's objection. Thus, the defendant's argument on this point is without merit.

■■ We decline to hold that the *Miranda* warnings Conley received at the October 7 interrogation induced him to remain silent upon his arrest nine days later. Initially, we note that had Conley made incriminating statements during a second interrogation following arrest without being advised of his *Miranda* rights, Conley would be taking a position contrary to the one he advocates here— that is, Conley would be arguing that the *Miranda* warnings given nine days earlier are insufficient. (See *People v. Rosario* (1972), 4 Ill. App. 3d 642, 645-46, 281 N.E.2d 714.) Moreover, Conley agreed to talk with Officer Houlihan on October 7. If the *Miranda* warnings did not induce him to remain silent on October 7, then we cannot say those same warnings induced him to remain silent nine days later. Therefore, on the facts presented here, we do not believe *Doyle* applies.

Nonetheless, we further find that there was no "use" of the defendant's post-arrest silence. In *Greer v. Miller*, the Supreme Court stated it was significant that in each of the cases in which it applied *Doyle*, the trial court had "permitted specific inquiry or argument respecting the defendant's post-*Miranda* silence." (*Greer v. Miller*, 483 U.S. at 764, 97 L. Ed. 2d at 629, 107 S. Ct. at 3108.) The Court concluded there was no *Doyle* violation because the trial court sustained the defendant's objection, no further comments were made during the remainder of the trial, and the trial court instructed the jury to disregard questions to which objections were sustained. (*Greer*, 483 U.S. at 764, 97 L. Ed. 2d at 629, 107 S. Ct. at 3108.) Here, the trial court did not permit specific inquiry or argument. As in *Greer*, Conley's objection was sustained. The jury was also instructed to disregard questions to which objections were sustained, and unlike *Greer*, the question posited to Conley was never completed. As to the prosecutor's comment during rebuttal argument, the trial court sustained Conley's objection and, thus, argument respecting Conley's silence was not permitted.

The defendant distinguishes *Greer* on the ground that the trial court here did not admonish the jury after sustaining his objection. A careful reading of *Greer* reveals, however, that the admonishment referred to by the defendant was only a direction to "ignore [the] ques-

tion for the time being." (*Greer*, 483 U.S. at 759, 97 L. Ed. 2d at 626, 107 S. Ct. at 3105.) No specific instruction was given. Further, as in *Greer*, Conley failed to request the trial court to give a specific instruction. (*Greer*, 483 U.S. at 764 n.5, 97 L. Ed. 2d at 629 n.5, 107 S. Ct. at 3108 n.5.) Therefore, we hold there was no specific inquiry or argument respecting Conley's silence.

■■■ The defendant's fifth and final contention is that he was improperly precluded from arguing to the jury that Sean's family had a financial motive in securing a verdict due to the extensive dental work that had been performed. The defendant was attempting to discredit the credibility of State witness Demetrius Kereakas, who had testified that he identified Conley from a picture in an Andrew High School yearbook. The testimony revealed that Mr. O'Connell had visited Demetrius at Richards High School where Mr. O'Connell had given Demetrius the yearbook. The defendant argues that Kereakas' credibility is suspect because no one besides Mr. O'Connell was present when Kereakas made the identification, and Mr. O'Connell may have pressured Kereakas into picking Conley.

Closing argument must be based on the evidence or on the reasonable inferences drawn therefrom. (*People v. Bullock* (1987), 154 Ill. App. 3d 266, 273, 507 N.E.2d 44.) The defendant correctly states that financial bias is a legitimate method of impeaching the credibility of a witness. (*People v. Thompson* (1979), 75 Ill. App. 3d 901, 903, 394 N.E.2d 422, 425.) Here, however, the individual with the alleged financial bias is Mr. O'Connell, who did not testify. Demetrius Kereakas has no financial interest, and Mr. O'Connell's bias cannot be transferred to Kereakas. There was no evidence that Mr. O'Connell pressured Kereakas or engaged in suggestive conduct which could have led Kereakas to Conley's photograph. Therefore, the trial court properly sustained the State's objection to the defendant's remarks.

The judgment of the circuit court is affirmed.

Judgment affirmed.

FREEMAN, P.J., and WHITE, J., concur.