FIRST DIVISION
February 19, 2008

No. 1-06-0450

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| ROOSEVELT CLAY, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE WOLFSON delivered the opinion of the court:

Nearly thirty-three years have passed since the murders of a doctor and two of his patients, committed in the course of a kidnapping. Defendant Roosevelt Clay has twice been tried for and convicted of these murders. In this appeal, the defendant seeks a third trial. While we are troubled by some of the issues he raises, we conclude the overwhelming weight of the evidence requires us to affirm his convictions and sentences for murder and kidnapping.

A jury convicted the defendant of three counts of murder. He was sentenced to concurrent indeterminate terms of 60 to 120 years in prison. On appeal, defendant contends the trial court erred in allowing the State to impeach defendant's trial testimony with his prior murder conviction. Defendant also contends he received ineffective assistance of trial counsel, in

violation of his Sixth Amendment rights.

Because prejudice to the defendant is a central issue raised by his ineffective assistance claim, we find it necessary to set out the relevant facts in some detail.

FACTS

Defendant was convicted in 1988 for the 1975 murders of Dr. Lawrence Gluckman and two of Dr. Gluckman's patients, Minnie and Tressie Harris. In 2004, defendant filed a post-conviction petition, alleging newly discovered evidence disclosed that Frank Love, a key witness for the prosecution, had lied about his motive for testifying at defendant's trial. The trial court granted defendant's post-conviction petition and ordered a new trial. The second trial took place in December of 2005.

Prior to re-trial, defense counsel filed a motion *in limine* to bar the State from impeaching defendant's testimony with his 1989 murder conviction in Wisconsin. The trial court denied the motion, finding the prejudicial impact of the conviction was outweighed by its probative value.

At the second trial in 2005, the evidence established that at around 6:20 p.m. on April 25, 1975, Chicago police found the bodies of Dr. Lawrence Gluckman and two of his patients, Minnie and Tressie Harris, in Dr. Gluckman's car. The car was parked in the middle of an alley at 10526 S. Lowe in Chicago. Dr.

Gluckman's body was found in the trunk, and the women's bodies were found partially covered with green plastic garbage bags in the back seat. The rear window of the car was shattered. An autopsy indicated Dr. Gluckman sustained a blunt force trauma to the head and died of a heart attack. Minnie and Tressie Harris both died as a result of gunshot wounds to the head.

The parties stipulated that Dr. Gluckman, Minnie Harris, and Tressie Harris left Dr. Gluckman's clinic at Warren and Western at around 4 p.m. on April 25. Three phone calls were made to Dr. Gluckman's wife between 6:30 and 7:20 that evening, each demanding $100,000 be paid or Dr. Gluckman would be killed.

On April 27, 1975, Detective Anthony Katalinic arrested Frank Love after Delores Townsend named him in a statement. According to Detective Katalinic, Love implicated six people in the kidnapping and murders: Roosevelt Clay, David Clay, Harold Smith, Matthew Williams, Michael Wilson, and Willie Carter. When Detective Katalinic went to Annie Clay's--defendant's mother's-- home, he was given permission to search the garage. He recovered glass shards from the floor and green plastic bags similar to the type found covering the victim's bodies in Dr. Gluckman's car. Detective Katalinic testified that Franklin Scott identified defendant in a lineup as being one of the people he saw standing behind Dr. Gluckman's clinic on the afternoon of the abduction.

The prior testimony of a deceased witness, Frank Scott, was published to the jury. Scott testified that he owned a restaurant directly behind Dr. Gluckman's clinic. At around 3:30 p.m. on April 25, 1975, Scott saw seven or eight men talking in the alley behind Dr. Gluckman's clinic. The men were standing near a car that had its trunk hood open. Scott identified defendant and Harold Smith in court as two of the men he saw in the alley.

Scott Jennings testified that, in 1983, he worked as an FBI agent in the Chicago office. On June 13, 1983, Jennings met defendant in the Cook County Jail after defendant told him he had information regarding a murder. After being advised of his Miranda rights, defendant signed a waiver of his rights and gave an oral statement regarding his involvement in a triple murder in 1975. Jennings testified he told defendant he could be prosecuted for the murders, and that no threats or promises were made to induce defendant to confess. Jennings denied telling defendant to "beef up" the story and make himself an eyewitness because hearsay "wasn't good enough." Jennings contacted Detective Katalinic and arranged for him to interview defendant.

Detective Katalinic testified defendant gave him details during his confession that he was not able to get from anyone else questioned, including Love and Scott. Defendant told

-4-

Detective Katalinic that sometime in April 1975 he went to his brother David's house and walked in on a meeting. His brother, Willie Carter, Frank Love, Matthew Williams, and Michael Wilson were discussing a plan to kidnap Dr. Gluckman. Defendant insisted on being included in the plan. Defendant told Detective Katalinic that he brought the gun and drove to the clinic in a separate car. When Dr. Gluckman came out of the back door of the clinic with two women, defendant gave the gun to Smith. They both approached the doctor with the gun drawn. They ordered Dr. Gluckman to get into the trunk of his car. When Dr. Gluckman refused because he had a bad heart, Smith and Carter picked him up and put him in the trunk. After Williams forced the two women into the car, Williams drove the car to defendant's aunt's house.

Defendant told Detective Katalinic that when he discovered Dr. Gluckman was dead, he and Carter went into the house to talk to David Clay and Wilson. They decided to shoot the two women. When defendant and Carter got into the car with the two women, Carter asked, "Which one of you bitches wanna die first?" Carter then shot the women. Williams and defendant abandoned Dr. Gluckman's car at 106th and Lowe. When Williams got into defendant's car, defendant noticed Williams was wearing Dr. Gluckman's gold ring and gold watch with an orange face. After defendant told Williams to get rid of the jewelry because it

could link them to the murders, he drove Williams to a gas station where Williams left the jewelry in a bathroom. Defendant told Detective Katalinic that everyone involved in the kidnapping, except for Love, was a Vicelord. Defendant said some Vicelords visited Love at jail after he was arrested. They threatened to kill him if he cooperated with the police. Dr. Gluckman's daughter testified Dr. Gluckman was wearing a gold watch when he went to work on April 25, 1975.

Frank Love testified he became Dr. Gluckman's patient in 1974 or early 1975. Love became a friend of Delores Townsend, Dr. Gluckman's office manager. Five days before the murders, Townsend called Love and asked him if he knew anyone who would kidnap Dr. Gluckman for ransom. Love contacted David Clay, a leader of the Vicelord gang, because he knew David Clay had previously kidnapped a drug dealer. David Clay said he was interested and helped plan the kidnapping.

When Love and David Clay met at a pool hall on April 25, 1975, David told Love the kidnapping was in progress. When they drove by Dr. Gluckman's clinic, Love saw defendant and Michael Wilson waiting behind the clinic in the alley. Love and David Clay arrived at defendant's aunt's house later that day. Defendant told them Dr. Gluckman was dead and the two girls were still in the car. Love then left with David Clay and Wilson to

pick up Townsend because she had the phone numbers for the Gluckman family.

Following his arrest, Love gave a statement implicating defendant and David Clay. While Love was at Cook County Jail awaiting trial, defendant and David Clay were transferred to the same tier. Love testified defendant and David Clay told Love to "keep his mouth shut and do the time, take the weight." Love did not testify against either defendant or David Clay in the 1970s. In 1988, however, Love testified against defendant at his first trial. Shortly after defendant was sentenced, the prosecutor appeared before the parole board to support Love's parole request. Love testified he had hoped he would be released from prison after testifying against defendant, but denied being promised anything in exchange for his testimony.

Alan Pollikoff testified he represented defendant on April 30, 1975, and was present when Franklin Scott identified defendant in a lineup. Pollikoff testified that after Scott identified defendant and a second man, Scott said "[t]hose two are the ones that most closely resemble the ones."

Defendant testified. He denied any involvement in the kidnapping or murders. In 1983, defendant had contacted the FBI after he was arrested for two armed robberies and was put in touch with Agent Jennings. He offered to provide Jennings with

information about Mike Switek, a leading mob figure. In exchange for help in the armed robbery cases, defendant agreed to wear a wire when he went to repay Switek for a cocaine debt.

Defendant contacted Jennings again after he was convicted of armed robbery. According to defendant, Jennings said he would try to get defendant out of jail because he wanted more information on Switek. Because defendant was in State custody, Jennings told him he had to "give the State something." Defendant told Jennings he had information regarding a murder. When Jennings said he needed "eyewitness stuff," defendant lied and said he was present when the murder occurred. Jennings and another agent came to the jail to interview him. Defendant gave them information about Dr. Gluckman's kidnapping that he had learned from various sources--including the media, Love, Willie Carter, Fast Black, and Michael Wilson. Defendant testified he and Love had talked a lot about the offense while they were in jail together. Defendant said that when he gave his statement to Detective Katalinic, he included things he had heard from others and things he had made up.

In rebuttal, the State presented a certified copy of defendant's 1989 murder conviction in Wisconsin. The trial court instructed the jury that "[e]vidence of a defendant's previous conviction may be considered by you only as it may affect his

believability as a witness and must not be considered by you as evidence of his guilt for the offense for which he is charged."

Defendant was found guilty of three counts of murder and sentenced to concurrent 60 to 120-year prison terms.

DECISION

I. Prior Murder Conviction

Defendant contends the trial court erred in allowing the State to impeach his testimony with a prior murder conviction in Wisconsin. Defendant contends the prior conviction's unfair prejudicial effect far outweighed any probative value it may have had regarding defendant's credibility.

In People v. Montgomery, 47 Ill. 2d 510, 515, 268 N.E.2d 695 (1971), our supreme court provided trial courts with discretion to allow impeachment of a witness' testimonial credibility by admitting a prior conviction. In Illinois, a prior conviction may be used to impeach a defendant where: (1) the prior conviction was for a crime punishable by death or imprisonment in excess of one year, or a crime involving dishonesty or false statement; (2) the witness' conviction or release from confinement, whichever date is later, occurred less than 10 years from the date of trial; and (3) the danger of unfair prejudice does not substantially outweigh the probative value of the conviction. Montgomery, 47 Ill. 2d at 518; People v. Cox, 195

1-06-0450

Ill. 2d 378, 383, 748 N.E.2d 166 (2001). In performing the balancing test, courts consider:

> " 'the nature of the prior crimes, *** the
> length of the criminal record, the age and
> circumstances of the defendant, and, above
> all, the extent to which it is more important
> to the search for truth in a particular case
> for the jury to hear the defendant's story
> than to know of a prior conviction.' "
> Montgomery, 47 Ill. 2d at 518, quoting Fed.
> R. Evid. 609 advisory committee notes.

The trial court uses its discretion when conducting the balancing test to determine whether a witness' prior conviction is admissible for impeachment. Cox, 195 Ill. 2d at 383; People v. Phillips, 371 Ill. App. 3d 948, 949, 864 N.E.2d 823 (2007). Absent an abuse of discretion, we will not reverse a trial court's determination. People v. Reid, 179 Ill. 2d 297, 313, 688 N.E.2d 1156 (1997). However, the failure to conduct a "meaningful" balancing test violates Montgomery and requires reversal. People v. McGee, 286 Ill. App. 3d 786, 793, 676 N.E.2d 1341 (1997). An earlier conviction has probative value if it can aid in destroying a defendant's credibility. People v. McKibbibs, 96 Ill. 2d 176, 188, 449 N.E.2d 821 (1983); People v.

-10-

1-06-0450

<u>Barner</u>, 374 Ill. App. 3d 963, 971, 871 N.E.2d 849 (2007).

The fact that the past and present offenses are of the same or similar nature does not bar their admissibility as impeachment. <u>Barner</u>, 374 Ill. App. 3d at 971. However, "[c]onvictions for the same crime for which the defendant is on trial should be admitted sparingly." <u>Cox</u>, 195 Ill. 2d at 384, citing <u>People v. Williams</u>, 161 Ill. 2d 1, 38, 641 N.E.2d 296 (1994).

In this case, defense counsel filed a motion *in limine* to bar the State from impeaching defendant's testimony with his 1989 murder conviction in Wisconsin. Denying the motion, the trial court held:

> "if [defendant] does want to testify, which he surely has the right to do, he brings his baggage on himself, and it is part of who he is, and the jury has a right to know who he is, and I find this problem extremely probative, by far more probative than prejudicial. *** He is a convicted murderer, and that is a fact. If he wants to testify, the jury will know about that up front."

In response to the trial court's ruling, defense counsel noted the conviction should be probative "as to whether defendant

-11-

is a liar, not whether he is a killer." The trial court agreed, noting: "The jury will be instructed to only consider that information as it may impact his credibility and not to consider it as evidence for the charge for which he is accused." The trial court denied defendant's motion to reconsider its ruling.

In People v. Williams, 173 Ill. 2d 48, 82-83, 670 N.E.2d 638 (1996), the supreme court held admissible the defendant's prior conviction for aggravated battery to impeach his credibility at his trial for attempt murder, murder, and aggravated battery with a firearm. The court found a review of the transcript showed the judge was fully aware of the Montgomery standard and the balancing test it requires. Williams, 173 Ill. 2d at 83. Although the trial judge did not expressly state he was balancing the opposing interests, the court held there was no reason to suppose he disregarded the familiar, well-established Montgomery standard in determining the impeachment was proper. Williams, 173 Ill. 2d at 83. The supreme court also noted its prior decisions regarding the Montgomery standard should not be construed as leaving only convictions for offenses involving dishonesty or false statement as eligible grounds for impeachment. Williams, 173 Ill. 2d at 82-83, citing Williams, 161 Ill. 2d at 39.

Here, as in Williams, we find the trial court did not abuse

its discretion in admitting defendant's prior murder conviction for the purpose of impeaching his credibility.  Contrary to defendant's contentions, nothing in the record suggests the trial court failed to properly weigh the probative value of the impeachment against its possible prejudicial effect.  Defendant suggests the trial court's statements that "he brings his baggage on himself, and "it is part of who he is, and the jury has a right to know who he is" indicates the trial court found the prior murder conviction probative of defendant's murderous propensity, not his credibility.  We might agree if the trial court had not said the jury would "be instructed to only consider that information as it may impact his credibility and not to consider it as evidence for the charge for which he is accused."

While we recognize the trial court did not specifically articulate the Montgomery standard when it denied defendant's motion *in limine*, we find the record indicates it did not disregard the well-established standard in determining impeachment was proper.  See Williams, 173 Ill. 2d at 83.  In denying defendant's motion to reconsider, the trial court made clear "the ultimate criteria is one of weighing the prejudicial value against probative value."  The trial court's comments go beyond the comments held sufficient in Williams.

We also recognize that when the conviction was admitted as

rebuttal evidence, the trial court instructed the jury that "[e]vidence of a defendant's previous conviction may be considered by you only as it may affect his believability as a witness and must not be considered by you as evidence of his guilt for the offense for which he is charged." We find it important to note, however, that whether the use of the instruction under these circumstances actually eliminates the risk of misuse is a matter open to question. Several studies indicate "jurors use evidence regarding convictions as an indicator of guilt rather than to determine the credibility of statements made by the defendant, despite judicial instructions to the contrary." See J. Liberman, *Understanding the Limits of Limiting Instructions*, 6 Psychol. Pub. Pol'y & L. 677, 686 (2000); R. Wissler & M. Saks, *On the Inefficacy of Limiting Instructions*, 9 Law & Hum. Behav. 37, 47 (1985).

We do not discount defendant's claim that the prior murder conviction has little to do with "defendant's truthfulness as a witness." See Cox, 195 Ill. 2d at 384, citing Williams, 161 Ill. 2d at 39. Nor do we minimize the great risk that a murder trial jury would misuse a prior murder conviction as proof of the defendant's propensity to commit that crime. Still, considering the strength of the State's case and the binding authority of Williams, we are unable to say the trial court abused its

-14-

discretion when it allowed the use of the prior murder conviction to impeach the defendant's credibility.

II. Ineffective Assistance of Counsel

Defendant contends he was denied his Sixth Amendment right to the effective assistance of trial counsel when his trial attorney: (1) characterized him as a "gangbanger" and a "bad person" who had committed several unrelated felonies and had ties to organized crime; (2) failed to utilize prior testimony to impeach a key witness; (3) elicited inflammatory testimony that defendant's family may have tried to firebomb Frank Love's house prior to trial; (4) did not move to strike prejudicial testimony that was volunteered by Love on cross-examination; and (5) failed to object to two instances of prosecutorial misconduct during closing argument. Defendant contends his trial counsel's deficient performance prejudiced him and resulted in a fundamentally unfair trial. Each of defendant's contentions will be addressed in turn.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must show his attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness, and that, without those errors, there was a reasonable probability his trial would have resulted in a different outcome. People v. Ward, 371 Ill. App. 3d 382, 434,

1-06-0450

862 N.E.2d 1102 (2007), citing <u>Strickland v. Washington</u>, 466 U.S. 668, 687-94, 104 S. Ct. 2052, 2064-68, 80 L. Ed. 2d 674, 693-98 (1984). Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689, 104 S. Ct at 2065, 80 L. Ed. 2d at 694; <u>People v. Edwards</u>, 195 Ill. 2d 142, 163, 745 N.E.2d 1212 (2001). Mistakes in strategy or tactics alone do not amount to ineffective assistance of counsel; nor does the fact that another attorney may have handled things differently. <u>Ward</u>, 371 Ill. App. 3d at 434, citing <u>People v. Palmer</u>, 162 Ill. 2d 465, 476, 643 N.E.2d 797 (1994).

Because a defendant's failure to satisfy either prong of the <u>Strickland</u> test will defeat an ineffective assistance claim, we are not required to "address both components of the inquiry if the defendant makes an insufficient showing on one." <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct at 2069, 80 L. Ed. 2d at 699. Accordingly, we need not determine whether counsel's performance was actually deficient if we determine defendant suffered no prejudice as a result of his counsel's alleged deficiencies. <u>Edwards</u>, 195 Ill. 2d at 163, citing <u>Strickland</u>, 466 U.S. at 697, 104 S. Ct. at 2069, 80 L. Ed. 2d at 699.

A. Defense Counsel's Opening Statements

Defendant contends his trial counsel's opening statement

-16-

needlessly informed the jury that defendant was a "gangbanger" and a "bad guy" who had committed several unrelated felonies and had ties to organized crime. Defendant contends defense counsel's statements cast him in an extremely negative light, and allowed the State to elicit irrelevant and prejudicial references to his gang affiliation at trial.

During its opening statement, the State argued the case involved a botched kidnapping for ransom in which three victims were murdered. The State did not discuss defendant's gang affiliation or prior criminal history. In his opening statement, defense counsel said:

> "My client is a bad guy. I might as well
> tell you that up straight because you're
> going to find out. My client probably hasn't
> done six months work, of legitimate work in
> his whole life. He's 50 plus years old.
> Hasn't done it. My client is what police or
> you or I *** would call a gangbanger. He's a
> member of a street gang. *** He stole cars,
> used dope, probably ran guns. He did all of
> the things that gang members do, but he's not
> on trial for being a gang member. He's on
> trial for a very serious crime that he didn't

1-06-0450

        do."

    We recognize an attorney's decision to mitigate the impact
of harmful evidence by disclosing it during opening statements
has been deemed proper trial strategy in certain cases.  See
People v. Wright, 294 Ill. App. 3d 606, 614-15, 691 N.E.2d 94
(1998) ("David's trial counsel chose to dispute, [by opening the
door to gang-related evidence] in her opening statement, the
issue of David's possible motive for shooting Smith and Rockett.
This decision fell squarely within the tactical province of an
attorney.")  However, we find defense counsel's references to
defendant as a "gangbanger" and as a "bad guy *** who did all of
the things that gang members do" crossed the line into
objectively unreasonable prevailing professional norms.

    Even if we were to excuse defense counsel's references to
defendant as a "gangbanger" and a "bad guy" as a matter of trial
strategy, defense counsel being desperately in need of a
strategy, we see no advantage in informing the jury that
defendant "stole cars, used dope, [and] probably ran drugs."
Accordingly, we find defense counsel's comments were objectively
unreasonable under Strickland.

    However, we find defendant's claim fails because he is
unable to establish the comments had impact on the outcome of his
trial.  The evidence against the defendant was overwhelming.

-18-

Agent Jennings and Detective Katalinic both testified defendant confessed his involvement in the 1975 triple murder while in prison for unrelated armed robbery charges. Frank Scott identified defendant in court and in a lineup as one of the men he saw in the alley behind Dr. Gluckman's clinic on the day of the kidnapping. An accomplice, Love, testified about defendant's role in the crimes. While defendant testified he lied to Agent Jennings and Detective Katalinic regarding his involvement in the murders and simply relayed information he had overheard from Love, Detective Katalinic testified defendant gave specific details regarding the murders that he was not able to get from anyone else who was questioned, including Love.

Moreover, defendant's own testimony mitigated the prejudicial impact of several of defense counsel's comments. Defendant testified at trial that he was cooperating with the FBI while awaiting trial for armed robbery. According to defendant, he agreed to wear a wire for the FBI when he went to pay back a cocaine debt he owed to Mike Switek, "a leading mob figure." Defendant admitted that when he saw Switek, he did not give him the money the FBI had provided. Instead, defendant kept the money and "smoked it up in dope." Defendant's own testimony established the veracity of several of defense counsel's allegedly improper opening comments--that defendant "used dope,"

dealt drugs, and associated with people involved in organized crime.

Because of the overwhelming evidence of defendant's guilt in this case, defendant cannot show a reasonable probability that the outcome of the case would have been different had defense counsel not made the references to gang activity and unrelated crimes in his opening statement. See People v. Williams, 368 Ill. App. 3d 616, 622, 858 N.E.2d 606 (2006).

B. Failure to Impeach Love by Omission

Defendant contends his trial counsel was ineffective for failing to impeach Love by omission. Defendant contends that given the importance of Love's testimony, counsel's failure to impeach him was objectively unreasonable and prejudicial to defendant's case. See People v. Williams, 329 Ill. App. 3d 846, 769 N.E.2d 518 (2002); People v. Mejia, 247 Ill. App. 3d 55, 65, 617 N.E.2d 799 (1993).

At defendant's second trial, Love testified David Clay and defendant approached him in Cook County Jail in 1975 or 1976 while they all were on the same tier. Defendant and David Clay told Love he "needed to keep [his] mouth shut and do the time, take the weight" for them. Love testified he initially kept quiet regarding defendant's involvement in the murders because he was scared. Later in his testimony, Love again said defendant

and David Clay approached him in jail and intimidated him into not implicating them in the crime. In defendant's first trial, however, Love did not say defendant and David Clay tried to intimidate him. Defendant contends his trial counsel's failure to impeach Love with this alleged omission amounted to ineffective assistance.

Under the rule for impeachment by omission, it is permissible to use a witness' prior silence to discredit his or her testimony if: "(1) it is shown that the witness had an opportunity to make a statement, and (2) under the circumstances, a person normally would have made the statement." Williams, 329 Ill. App. 3d at 854; People v. Conley, 187 Ill. App. 3d 234, 244, 543 N.E.2d 138 (1989). The decision whether to cross-examine or impeach a witness is generally a matter of trial strategy that will not support a claim of ineffective assistance. Williams, 329 Ill. App. 3d at 854.

In this case, nothing in the transcript from defendant's first trial indicates Love was specifically questioned about whether he was intimidated by defendant and David Clay while in jail. During cross-examination, defense counsel asked: "And while you were at the County Jail some time during that fall of 1975 you saw [defendant]?" After respondent answered yes and said he was on the same tier as defendant, defense counsel asked

Love whether he told defendant he made a statement implicating him. Love responded that defendant "knew already." Neither the State nor the defense questioned Love regarding whether David Clay was present, or whether defendant attempted to intimidate Love from testifying. Contrary to defendant's contention, we find nothing in the record of the first trial that concretely suggests Love had an opportunity to make a statement indicating David Clay and defendant intimidated him.

Because large portions of Love's testimony in defendant's first and second trial were consistent, impeachment by omission would have been difficult and potentially counter productive. We find defense counsel was not ineffective for failing to attempt to impeach Love by omission.

C. Inflammatory Testimony

Defendant contends defense counsel was ineffective for not moving to strike Love's non-responsive and inflammatory testimony on two occasions during his cross-examination.

Prior to jury selection, the prosecutor disclosed that Frank Love, a key State witness, had informed the State that his neighbor's house had been firebombed with a "Molotov cocktail" the night before. After the State said there was no evidence linking defendant to the act, the trial court admonished the State not to bring it up in its case-in-chief. The trial court

also cautioned defense counsel not to "open the door" by cross-examining Love regarding what benefits he might be receiving by testifying.

During Love's cross-examination, however, the following colloquy occurred:

"Q [defense counsel].  Do you have some animosity toward Mr. Clay, Roosevelt Clay?

***

A.  Well, I'll tell you this since you asked that question.  A firebomb was thrown in the house next door to me last night, early morning, and I believe his family had something to do with that.  I believe that.  If somebody is firing to firebomb you and your family, would you have any animosity?

Q.  Do you think Mr. Clay --

A.  Yes, I do believe that.

***

Q.  Does that incident have anything to do with your testimony here today?

A.  No.

Q.  Nothing?  It has no effect on it?

A.  You asked me did I have animosity.  That's what you asked me.

> Q. So you have animosity?
>
> A. I believe that family tried to harm me and my family this morning.
>
> Q. But you have no evidence of this?
>
> A. I'm just telling you my thoughts.
>
> ***
>
> Q. Was it your house that was firebombed?
>
> A. It was my neighbor.
>
> Q. Your neighbor's house?
>
> A. I think they got the wrong house.
>
> Q. Oh, I see.
>
> A. Let me just say this since we talking about this. That's one of the gang's intimidation things that they doing in the city of Chicago now, firebombing witnesses."

Defendant contends his trial counsel was ineffective for failing to move to strike Love's non-responsive answers regarding the firebombing incident during trial.

Defendant also contends his trial counsel was ineffective for failing to move to strike Love's testimony on cross-examination that David Clay had tried to intimidate him at gunpoint.

During direct examination, Love testified that he was contacted by "the Clay family" over the years.  The trial court overruled a defense objection to the testimony but instructed Love to be more specific.  Love said "David Clay and his thug friends" had come to his house several times, wanting him to sign an affidavit saying that the information defendant had given in his statements regarding the triple murders had come from conversations with Love.  On cross-examination, the following occurred:

> "Q [defense counsel].  These--you testified that you were threatened by David Clay or you perceived some of David Clay's conduct as a threat, is that correct?
>
> A.  Anytime someone come to your house with a pistol.
>
> ***
>
> Q.  You didn't say that during direct examination --
>
> COURT: Objection sustained.  He's only answering questions.  Ask a different question."

While we recognize defense counsel did not move to strike Love's testimony regarding the firebombing incident, we note he

did move for a mistrial following Love's dismissal as a witness, noting Love seemed "like he was chomping at the bit to get out this firebombing of his house." Denying the motion, the trial court held that defense counsel had "opened that door" with an open-ended question, and that "[t]he jury never would have known about [the firebombing] but for the question you asked." Regardless of whether a motion to strike would have been successful, the jury had heard the testimony. The damage was done.

Even if we were to assume defense counsel's actions were objectively unreasonable, we find there was no reasonable probability that, but for counsel's failure to move to strike the allegedly inflammatory testimony, the result of defendant's trial would have been different. While Love indicated he believed defendant's family was responsible for the firebombing of his neighbor's house, he admitted he had no evidence linking defendant to the crime. Love had already testified extensively regarding David Clay's attempts to intimidate him into not testifying. Because the evidence adduced against defendant in this case was overwhelming, we find Love's volunteered testimony regarding the gun and the firebombing incident did not effect the outcome of the trial.

D. Closing Argument

1-06-0450

Defendant contends trial counsel was ineffective for failing to object to the prosecutor's improper closing arguments.

Specifically, defendant contends counsel failed to object when the prosecutor improperly attacked the credibility of Alan Pollikoff, a defense witness. Defendant contends the prosecutor's arguments amounted to a thinly veiled accusation that Pollikoff was lying because he was paid money--without evidence to support the accusation.

Although prosecutors enjoy a wide latitude in closing arguments (People v. Bakr, 373 Ill. App. 3d 981, 990, 869 N.E.2d 1010 (2007)), a prosecutor's statement that a witness was lying is improper if it is not based on evidence (People v. Johnson, 114 Ill. 2d 170, 199, 499 N.E.2d 1355 (1986)). Whether we consider a prosecutor's statements reversible error depends on whether the errors were so fundamental as to deny defendant a fair trial. People v. Nunn, 357 Ill. App. 3d 625, 638-39, 829 N.E.2d 796 (2005).

During rebuttal closing argument, the prosecutor said:

> "Franklin Scott, somebody who had nothing to do with nothing, identifies Roosevelt Clay. Now, Mr. Pollikoff, being paid by the Vicelords, and Mr. Clay, when he viewed the lineup, he had to come up with something for

-27-

his client."

We find the prosecutor's statements that Pollikoff was "being paid by the Vicelords" and "had to come up with something for his client" were not supported by the evidence presented at trial. It was error to make that argument. Still, we find the prosecutor's comments did not deny defendant the right to a fair trial. As we have noted above, the evidence against the defendant was overwhelming. The judge also instructed the jury that "closing arguments are not evidence." Accordingly, we find defendant is not able to establish he was prejudiced by defense counsel's failure to object to the prosecutor's statement. See Nunn, 357 Ill. App. 3d at 639.

Defendant also contends his trial counsel failed to object when the prosecutor misstated the presumption of innocence.

During rebuttal argument, the prosecutor said:

> "[defendant] has had a fair trial, overwhelming evidence has been amassed against him, he's had the full benefits of his rights, and now the presumption of innocence is gone. It's time to make him responsible for the pain and tragedy that he's wreaked on people just because he wanted to make a fast buck."

1-06-0450

Following closing arguments, the trial court instructed the jury that:

> "The defendant is presumed to be innocent of the charges against him.  This presumption remains with him throughout every state of the trial and during your deliberations on your verdict and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that he is guilty."

While we agree the statement that defendant's "presumption of innocence is gone" was a misstatement of law, we find it did not affect defendant's substantial rights.  The State made only one reference to the presumption of innocence, and the trial court extensively explained the presumption of innocence in its closing comments to the jury.  See Nunn, 357 Ill. App. 3d at 638-39; People v. Brooks, 345 Ill. App. 3d 945, 952, 803 N.E.2d 626 (2004).

We find defendant was not prejudiced by his trial counsel's failure to object to the prosecutor's arguments.

E. Cumulative Effect of Errors

Defendant contends the cumulative effect of defense counsel's errors rendered his trial fundamentally unfair.  While

individual errors may have the cumulative effect of denying a defendant the right to a fair trial, "no such accumulated error occurs where none of the separate claims amounts to reversible error." People v. Dresher, 364 Ill. App. 3d 847, 863, 847 N.E.2d 662 (2006). Because we find defendant was not prejudiced by any of his trial counsel's conduct, we also reject his cumulative error argument. See Dresher, 364 Ill. App. 3d at 863.

CONCLUSION

We affirm defendant's convictions and sentences.

Affirmed.

GARCIA, and R. GORDON, JJ., concur.