NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2022 IL App (4th) 210331-U

NO. 4-21-0331

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 10, 2022
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ISAIAH M. MILLER, Defendant-Appellant. | ) Appeal from the ) Circuit Court of ) McLean County ) No. 16CF1168 ) ) Honorable ) William A. Yoder, ) Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Presiding Justice Knecht and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's postconviction claim under *Brady v. Maryland*, 373 U.S. 83 (1963), is frivolous and patently without merit because the supposedly impeaching prior statement the State failed to disclose before trial was consistent with the witness's trial testimony and, thus, not impeaching.

¶ 2    In the McLean County circuit court, a jury found defendant, Isaiah M. Miller, guilty

of two counts of home invasion (720 ILCS 5/19-6(a)(2), (3) (West 2016)). The court sentenced

him to concurrent prison terms of 33 years and 10 years. After the judgment was affirmed on direct

appeal (see *People v. Miller*, 2020 IL App (4th) 180052-U, ¶ 2), defendant petitioned for

postconviction relief, alleging the State had violated *Brady v. Maryland*, 373 U.S. 83 (1963), by

failing to disclose, before trial, an impeaching statement. The court summarily dismissed the

petition as "frivolous or *** patently without merit" because, before the prior statement was

revealed in the witness's trial testimony, the prosecutor was unaware of the prior statement. 725

ILCS 5/122-2.1(a)(2) (West 2016). In our *de novo* review (see *People v. Shipp*, 2015 IL App (2d) 131309, ¶ 7), we affirm the summary dismissal, albeit on a different rationale (see *People v. Johnson*, 208 Ill. 2d 118, 129 (2003)). Our reason for affirmance is that the prior statement the State omitted to disclose before trial was not impeaching.

¶ 3                                    I. BACKGROUND

¶ 4        The evening of September 7, 2016, in Bloomington, Illinois, three black men, all of them wearing masks, entered the home of Bob and Karen Altman, uninvited. One of the men had a pistol.

¶ 5        At the time, because the pistol had a penlight crudely taped to it, Bob was unsure the pistol was a real firearm. Deeming it unwise to find out, he put down a kitchen knife he had picked up. When the holder of the pistol racked the slide and a cartridge fell onto the floor, Karen had no doubt the pistol was a real firearm. The prosecutor asked her:

"Q. And what kind of gun was it?

A. It was like a semiautomatic, like what I have.

Q. Now, what other indications did you have that made you believe that that was a real gun?

A. Um, a bullet fell out of it on the floor in front of me.

* * *

Q. *** What did the third person do with the gun in terms of after pointing it at you?

A. Pointed it at us. Um, I heard the cocking sound that the chamber makes when you pull back. I saw a bullet on the floor, and the laser sight was on my husband's head."

- 2 -

¶ 6        The intruders ordered the Altmans to lie down on the kitchen floor. Apparently Bob was too slow at complying or too slow at putting down the knife. He received a blow to the head with the butt of the pistol and a kick in the ribs.

¶ 7        While one of the intruders stood guard over the Altmans as they lay on the floor, the remaining two ransacked the house. The three intruders left with some cash, jewelry, two iPhones, Bob's pistol, and his medical marijuana. Although the robbery was recorded on an in-home surveillance system, the facial features of the intruders could not be made out behind the masks. The police investigation stalled.

¶ 8        Then, on October 8, 2016, in Normal, Illinois, Mark Peterson was arrested for retail theft. He offered to be a confidential source. He had some information: several months earlier, when Peterson was confined in the McLean County jail, a fellow inmate, Kendrick Cooley, told Peterson about a home invasion perpetrated in September or October 2016.

¶ 9        The Bloomington police agreed to use Peterson as a confidential source. He allowed them to put a recording device in his cell phone. On October 10, 2016, a phone conversation between Peterson and Cooley was recorded in which Cooley agreed to meet with Peterson the next day and sell him some stolen cell phones.

¶ 10        On October 11, 2016, while wearing a wire, Peterson met with Cooley. They had a conversation, in which Cooley explained he had stolen the phones in a home invasion that he had committed with defendant and another man, whose name Cooley did not know. Apparently, Peterson declined to buy the phones from Cooley.

¶ 11        Detective Jared Roth discovered that Cooley was trying to sell two iPhones on Facebook. Roth tried to track the Altmans' stolen iPhones. The phones pinged on a tower at Front and Allin Streets in Bloomington. Cooley lived near that location, at 711 West Front Street. The

police obtained a warrant to search his residence. On October 12, 2016, the police executed the warrant and found the Altmans' iPhones in a garbage can outside Cooley's residence. The police arrested Cooley, who, pursuant to a plea agreement, testified in defendant's trial.

¶ 12 Cooley's plea agreement was to testify "completely" and "truthfully" in return for 15 years' imprisonment. He testified he had been friends with defendant for about 10 years. Defendant came up with the idea of robbing the Altmans at their residence. Cooley agreed to participate. Defendant arrived at Cooley's house in a car driven by a man whom Cooley did not know. The three of them drove to the Altman house. Per defendant's instructions, Cooley had brought along a mask or a T-shirt to wrap around his face as a mask. Defendant was wearing a mask and was carrying a gun.

¶ 13 The prosecutor asked Cooley:

"Q. How did you know it was a gun?

A. Well, I knew it after we were in the house because I had touched it. I had it in my possession.

Q. When did you first see the gun?

A. I first saw a gun after we entered into the house.

Q. Did the Defendant at any point show you the gun during the car ride over to the Altman[s]?

A. No, sir.

＊ ＊ ＊

Q. Now, referring to the gun, you said you saw it the first time inside the Altman[s'] residence; is that correct?

A. Yes, sir.

Q. And you also touched it?

A. Well, I mean I've, I've seen it before; but on that night, yeah, the first time I had seen it was at the Altmans.

Q. Okay. Well, let me go back then in terms of when was the first time you saw that actual gun?

A. Probably—"

Defense counsel interrupted with the objection that "[t]his [was] undisclosed testimony." Until that moment in the trial, defense counsel had not "heard anything about [Cooley's] touching a gun."

¶ 14        The circuit court excused the jury from the courtroom. Outside the jury's presence, the prosecutor explained that he, too, had been taken by surprise. The prosecutor previously was unaware that Cooley had touched the pistol that defendant used in the home invasion. That fact was never mentioned in the police reports. Until then, it had been the prosecutor's understanding that Cooley had handled only the pistol stolen from the Altman residence. (Defendant gave that pistol to a man named Jerry Watson.)

¶ 15        The circuit court asked the prosecutor what the purpose was in inquiring whether Cooley had ever handled the pistol that defendant used in the home invasion. The prosecutor answered, "Your Honor, that he is familiar with the handgun; that, that it is an actual real gun; that he's seen it before."

¶ 16        The circuit court proposed that both the prosecutor and defense counsel question Cooley outside the jury's presence so they would know what he would say when the jury returned. The court did not consider it unreasonable to expect trial counsel to think on their feet.

¶ 17        Defense counsel, however, was unsatisfied with the circuit court's proposed remedy. He complained:

> "The only thing I've had from this witness that, in fact, he did not touch the gun, his final interview that is related to his proffer is that he did not touch the weapon at the home, did not possess the weapon that he claims my client brought. The only gun he ever touched in discovery is the gun they took from the Altman[s'] home. This is more than just a surprise to the State, Your Honor. And the State should have known the answer to this question. It[']s an exceptionally important element to the case. I appreciate the Court's instruction or option to cross at this point, but I think it goes beyond that."

The circuit court believed, however, that preparatory questioning of Cooley outside the jury's presence would be sufficiently curative.

¶ 18        During this questioning outside the jury's presence, Cooley explained that Roth had asked him only if he saw the gun *earlier that night* on September 7, 2016. He never told Roth he had seen the gun on previous occasions—that is, on occasions before the home invasion—because Roth never asked him if he had ever seen the gun before. Cooley had seen the gun on five or six previous occasions, including at his own residence when defendant came over for a visit. During the home invasion, Cooley admitted, defendant handed the gun to him, but Cooley did not cock the gun or pull the trigger. He believed the gun was real, a black 9-millimeter pistol with a laser sight attached to the bottom of the barrel. This was the substance of Cooley's testimony in the recess.

¶ 19        When the jury returned to the courtroom, the prosecutor asked Cooley:

"Q. Before we took a break, you informed us that the gun that you saw during the home invasion, that wasn't the first time you saw that gun; is that correct?

A. That is correct, sir.

Q. Now, this is the first time you are telling either myself *** or anyone from the State's Attorney[']s Office; is that correct?

A. Yes, sir.

Q. You never also told this information to the police officers when they interviewed you; is that correct?

A. No, sir.

Q. Why not?

A. I was not asked the question, sir.

Q. Pertaining to when you saw the gun on prior occasions?

A. Yes, sir.

Q. So did the detectives and those who questioned you only ask you pertaining to that specific night on September 7th of 2016; is that correct?

A. Yes, sir."

¶ 20    Cooley testified he first saw the pistol about six months before the home invasion. Defendant brought it to Cooley's house, to show it to him. Although Cooley's "knowledge of guns [was not] great," he believed the pistol was a 9-millimeter. It had a laser "[o]n the bottom of the barrel." The pistol was small. He handled it for about 30 seconds and then gave it back to defendant. In all, Cooley saw the pistol about four or five times before the home invasion.

¶ 21 Then, in his testimony, Cooley recounted the home invasion itself, during which he saw defendant "pull[ ] back the *** thing" on the pistol and he "heard something hit the floor, but [he could not] identify what [he] particularly heard hit the floor."

¶ 22 On cross-examination, Cooley admitted that on October 12, 2016, in the first interview, he told Roth, " [']I had nothing to do with this. What are you talking about?['] " and "[']It sounds like some other people got in trouble and threw me under the bus.['] " Then, when Roth abruptly left the interview room, Cooley thought about his own child. It seemed to Cooley he was in serious trouble and he could end up going to prison for 30 years. When Roth returned to the interview room, Cooley's "story changed dramatically," as Cooley admitted on cross-examination. This time, Cooley represented to Roth he was "simply a lookout" who "stayed in the car." That story likewise was false, for, in the preceding direct examination, the in-home surveillance video was played and Cooley had identified himself and defendant in the video. Eventually, Cooley was more forthcoming with the police about his participation in the home invasion.

¶ 23 Cooley admitted that, in the first interview, he never told Roth about touching the pistol that defendant had brought to the Altmans' home. The reason, Cooley explained, was he thought Roth was asking him about the Altmans' pistol. During the home invasion, Cooley did not touch the pistol stolen from the Altmans, although he touched the Altmans' pistol afterward. Defendant left the Altmans' pistol at Cooley's residence, and Cooley gave the pistol to Watson.

¶ 24 Defense counsel asked Cooley:

> "Q. Okay. And then today you add that you touched the weapon. You had the weapon in the home invasion, correct?
>
> A. No, not today. I added that previously.

Q. You're telling me you've told the State's Attorney about this?

A. The detectives. I told the detectives that I touched the gun that was used during the home invasion.

Q. Okay. And that never—okay. So, you're, you're sure you have told the detective—Detective Roth I presume—that you touched the gun used in the home invasion?

A. One hundred percent positive."

¶ 25　　　The State called Roth. On cross-examination, Roth testified he interviewed Cooley three times: on October 12 and December 1, 2016, and June 13, 2017. Roth recounted the changing stories that Cooley told in the first interview. In the first interview, the one on October 12, 2016, Roth asked Cooley, "Did you ever have the gun in your possession, not necessarily at your home?" and "his answer [was] no."

¶ 26　　　Defense counsel asked Roth:

"Q. Okay. Now was there ever a third interview where he followed up and said, [']Oh, no, I had the gun in my possession in the home invasion[']?

A. Yes.

Q. Was there? When was this?

A. There was an interview on December 1st, I believe, or early December, which would have been the second interview that I had with him. And then there was a third interview, I believe, on June 13th of 2017, somewhere in that area.

＊ ＊ ＊

Q. Now your—okay. You wrote a police report about the interview on December 1st, correct?

A. Correct.

\* \* \*

Q. Anywhere in your report did you indicate that he said 'I' possessed the handgun during the home invasion?

A. I don't believe so.

\* \* \*

Q. Okay. So your testimony today is that you simply neglected to mention that Mr. Cooley possessed the handgun that day of the home invasion in the home invasion?

A. If I failed to mention that in the report, I apologize. I must have—it wasn't on purpose. It must have been something I overlooked.

\* \* \*

Q. \*\*\*

It is possible you are mistaken as to him telling you in that second interview that he held the gun in question, correct?

A. You're talking about the gun that was brought?

Q. Yes.

A. It's possible. I mean, the interview that I had with him, the recording of that interview, it fairly and accurately depicts what our conversation was."

¶ 27    During a recess, when the jury was outside the courtroom, defense counsel informed the circuit court that after Roth's testimony, defense counsel watched the video of the second interview of Cooley (the interview of December 1, 2016) and nowhere in that interview did Cooley tell Roth he had possessed the gun brought to the home invasion.

¶ 28       The State rested, and the defense recalled Karen Altman. She admitted that in her recorded statement to the police, she said she had no idea whether the pistol wielded by the robbers was real.

¶ 29                                        II. ANALYSIS

¶ 30       According to defendant, his petition for postconviction relief stated a claim under *Brady* "where the State failed to disclose Kendrick Cooley's statement to the police that he had previously seen and possessed the alleged firearm which had been used in the home invasion."

¶ 31       Under *Brady* and its progeny, a defendant has a due process right to receive all evidence in the State's possession that is "favorable to the [defendant] and material to guilt or punishment," including impeachment evidence. *People v. Beaman*, 229 Ill. 2d 56, 73-74 (2008). To make out a claim under *Brady*, a defendant must show that "(1) the undisclosed evidence is favorable to the [defendant] because it is either exculpatory or impeaching; (2) the evidence was suppressed by the State either willfully or inadvertently; and (3) the [defendant] was prejudiced because the evidence is material to guilt or punishment." *Id.* "The prosecution's *Brady* obligation requires that the information subject to disclosure be turned over at such a time and in such a way that it can be meaningfully used by the defense." Examination of Witnesses § 2:6 (2d ed. 2021); see also *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009).

¶ 32       Defendant identifies the "undisclosed evidence" as Cooley's statement to Roth that, before the home invasion, Cooley possessed or touched the pistol that defendant used in the home invasion. *Beaman*, 229 Ill. 2d at 73-74. Defendant does not claim that this prior statement by Cooley was "exculpatory" or, in other words, that the statement had any tendency to clear defendant from guilt. *Id.* Rather, defendant claims that this prior statement was "impeaching." *Id.*

¶ 33       The appellate court has described the concept of impeachment as follows:

"Impeachment *** occurs where a witness testifies in a certain way, and the opposing party seeks to discredit that testimony through the use of other evidence. Black's Law Dictionary defines 'impeach,' in relevant part, as, 'To discredit the veracity of (a witness),' and 'impeachment' as, 'The act of discrediting a witness, as by catching the witness in a lie or by demonstrating that the witness has been convicted of a criminal offense.' [Citation.]" *Obermeier v. Northwestern Memorial Hospital*, 2019 IL App (1st) 170553, ¶ 115 (quoting Black's Law Dictionary 755 (7th ed. 1999)).

It is unclear how Cooley's prior statement that he handled the pistol before the home invasion had any tendency to discredit his testimony that he handled the pistol before the home invasion. Instead of being impeaching material, this "prior consistent statement" tended to "*bolster*" Cooley's testimony. (Emphasis added.) See *People v. Woods-Rivas*, 2021 IL App (1st) 192186-U, ¶ 56 (explaining that, "[a]s a general matter, proof of a prior consistent statement made by a witness is inadmissible hearsay when used to bolster a witness's testimony").

¶ 34        The impeaching material was in the first interview, in which Cooley either failed to mention handling the pistol before the home invasion or denied doing so. The question of denial is murky because Cooley testified he had understood Roth as asking about the Altmans' gun, not about defendant's gun. Even in their own questioning of Cooley, the attorneys could be rather vague in their references to "the gun." If Cooley's claimed misunderstanding were believed, the defense still might have been able to argue impeachment by omission. See *People v. Clay*, 379 Ill. App. 3d 470, 481 (2008) (explaining that, "[u]nder the rule for impeachment by omission, it is permissible to use a witness'[s] prior silence to discredit his or her testimony if: (1) it is shown that the witness had an opportunity to make a statement, and (2) under the circumstances, a person

normally would have made the statement" (internal quotation marks omitted)). In any event, our point is that the impeachment would come from the first interview, which was disclosed. Sometime after the first interview—it is unclear when—Cooley "added" to Roth that he handled the 9-millimeter pistol before defendant brought it to the home invasion, according to the testimonies of Cooley and Roth. That subsequent statement was not disclosed before trial. Rather, it came out during trial. But that subsequent statement, which matched Cooley's trial testimony, was not impeaching, and therefore its earlier nondisclosure did not violate *Brady*.

¶ 35    In sum, when Cooley supplemented his account by divulging to Roth that he touched the pistol before the home invasion, he made a statement that, by comparison to his trial testimony, was a prior *consistent* statement—and, therefore, not a statement that was impeaching. Because the statement was not arguably impeaching, the delay in its disclosure was not arguably a violation of *Brady*. See *Beaman*, 229 Ill. 2d at 73-74; *People v. Hodges*, 234 Ill. 2d 1, 11-12 (2009).

¶ 36    It follows that, contrary to defendant's further claim, trial counsel did not render ineffective assistance by omitting to move for a mistrial on *Brady* grounds. Nor did counsel on direct appeal render ineffective assistance by omitting to raise a *Brady* claim (or a claim of ineffective assistance premised on *Brady*). Refraining from raising an unmeritorious issue—in this case, the *Brady* issue—is not ineffective assistance. See *Strickland v. Washington*, 466 U.S. 668, 687 (1984) (explaining that the first element of a claim of ineffective assistance is that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment [(U.S. Const., amend. VI)]"); *People v. Edwards*, 195 Ill. 2d 142, 163-64 (2001); *People v. Peco*, 345 Ill. App. 3d 724, 735-36 (2004).

¶ 37                                III. CONCLUSION

¶ 38        For the foregoing reasons, we affirm the circuit court's judgment.

¶ 39        Affirmed.